IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA
CLARKSBURG

**UNITED STATES OF AMERICA,**

        **Plaintiff,**

v.                                     **Criminal Case No.: 1:23-CR-70**
                                          **(JUDGE KLEEH)**

**JACK LEE OLIVER,**

        **Defendant.**

## REPORT AND RECOMMENDATION RECOMMENDING THAT DEFENDANT'S MOTION TO SUPPRESS EVIDENCE [ECF NO. 27] BE DENIED

Pending before the undersigned Magistrate Judge is an amended motion to suppress evidence [ECF No. 27]¹ filed by Defendant Jack Lee Oliver ("Defendant") on February 23, 2024. By Referral Order dated February 27, 2024 [ECF No. 29], the Hon. Thomas S. Kleeh, Chief United States District Judge, referred the motion to the undersigned for conducting a hearing and entering a report and recommendation as to disposition of the motion.

The Court also is in receipt of the Government's response [ECF No. 28] in opposition to Defendant's motion, filed on February 27, 2024, as well as Defendant's reply [ECF No. 32] in support of the motion, filed on March 14, 2024. The undersigned conducted a hearing on Defendant's motion on April 2, 2024, at which the Court heard witness testimony and the arguments of counsel.

Based on a detailed review of Defendant's motion [ECF No. 27], the Government's response [ECF No. 28], Defendant's reply [ECF No. 32], the testimony given by the witness at the hearing on Defendant's motion, the arguments of counsel at the hearing, and pertinent legal

---

¹ Defendant initially filed a motion to suppress [ECF No. 26] before filing an <u>amended</u> motion to suppress [ECF No. 27] on the same date. The undersigned addresses the <u>amended</u> motion to suppress.

1

authority, the undersigned **RECOMMENDS** that Defendant's motion be **DENIED** as set forth herein.

## I. BRIEF FACTUAL AND PROCEDURAL BACKGROUND

Defendant stands accused in a 32-count indictment which a Grand Jury returned against him on December 5, 2023. [ECF No. 1]. Defendant is named in the Indictment with the offenses as follows:

- Filing False Tax Return, in violation of Title 26, United States Code, Section 7206(1), as charged in Counts One through Three; and

- Aiding and Abetting in Preparation of False Tax Return, in violation of Title 26, United States Code, Section 7206(2), as charged in Counts Four through Thirty-Two.

Defendant was a paid tax preparer, and as such, operated Insurance Depot, which was a business by which he sold insurance and prepared tax returns. Defendant came to the attention of the Scheme Development Center ("SDC"), an operation within the Internal Revenue Service ("IRS"). The SDC examines tax preparers' returns for patterns which could indicate problems with the returns. Defendant's returns came to the attention of SDC staffers because of the high number of returns by which taxpayers claimed refunds and which contained high numbers of tax forms Schedule C and Schedule F. The IRS conducted an undercover operation of Defendant and Insurance Depot. Based on that operation, the IRS then sought and obtained a search warrant for Insurance Depot. In executing the search warrant, agents seized certain documents.

Defendant challenges the propriety of the affidavit provided in support of the search warrant application, arguing that, under a Franks analysis, it fails to establish probable cause. Defendant focuses on Paragraph 48 of the affidavit, arguing that an error contained therein is a fatal flaw. As such, Defendant seeks to suppress materials recovered from the search of Insurance

Depot. In response, the Government argues that the affidavit is extensive and replete with demonstrations of probable cause, regardless of the minor error contained within Paragraph 48 of the affidavit.

## II. SUMMARY OF DEFENDANT'S CHALLENGE TO THE AFFIDAVIT

Defendant's challenge to the probable cause affidavit under Franks is nuanced. As such, it involves a review of detailed facts, and a summary of it is helpful at the outset.

During the investigation of Defendant, agents used an undercover operative to visit Defendant at Insurance Depot to prepare a tax return. The Government alleges that Defendant prepared a false tax return for the undercover operative.

Specifically, the Government alleges that Defendant often generated a false tax form Schedule C in the preparation of tax returns. Schedule C is used to report business income and expenses for sole proprietor operations or single-member LLCs. In the instant matter, the Government alleges, the undercover operative told Defendant that he did odd jobs as a handyman, and was paid in six-packs of beer or maybe a couple of hundred dollars. The undercover operative also told Defendant that he drove a 1984 Jeep Grand Wagoneer vehicle, on which he put a couple of hundred miles. From this, the Government alleges, Defendant generated a tax return for the undercover operative which included a false Schedule C that reflected gross receipts in the amount of $1,200.00, and expenses in the amount of $6,999.00. This reflected a supposed net loss of $5,790.00, causing the undercover operative's taxable income to be lowered. Ultimately, this resulted in a false tax return showing that the IRS owed the undercover operative a tax refund in the amount of $558.00.

The probable cause affidavit, at Paragraph 48, includes a table or chart which contrasts the figures for an accurately prepared tax return for the undercover operative, and the figures from the false tax return which Defendant allegedly prepared. The table is reproduced here:

| Line Item | Accurately Prepared Return | Return JACK OLIVER, II Prepared at Insurance Depot |
|---|---|---|
| Wages, salaries, tips, etc. | $36,574.00 | $36,574.00 |
| Schedule C loss | $0.00 | ($5,790.00) |
| Total income | $36,574.00 | $30,784.00 |
| Standard deduction | ($12,550.00) | ($12,550.00) |
| Taxable income | $24,024.00 | $18,234.00 |
| Tax | $2,684.00 | $1,988.00 |
| Federal income tax withheld | $2,546.00 | $2,546.00 |
| Total payments | $2,546.00 | $2,546.00 |
| Tax refund | ($138.00) | $558.00 |

Defendant's argument is that the amount of approximately $200.00 which the undercover operative said that he made from odd jobs should be reflected in the "Accurately Prepared Return" column under "Wages, salaries, tips, etc." by increasing the amount of $36,574.00 by $200.00. Alternatively, Defendant argues, the $200.00 figure should have been treated as a legitimate business expense such that the line for "Schedule C loss" under "Accurately Prepared Return" should reflect some amount of loss, not an amount of $0.[2] Defendant's argument, then, is that the

---

[2] Interestingly, if the $200.00 sum would have been included in the "Accurately Prepared Return" column, the tax owed would have been greater than the amount of $138.00 indicated, albeit probably a nominal amount. Thus, inclusion of the $200.00 sum in the "Accurately Prepared Return" column does not seem to

4

failure to reflect the $200.00 sum in the "Accurately Prepared Return" column is materially false such that the affidavit fails to establish probable cause. Thus, evidence seized from execution of the warrant on which the affidavit was based should be suppressed.

The Government acknowledges this mistake but stresses that it is so minor as to be irrelevant to the (alleged) fact that, in the end, Defendant prepared a false tax return. As summarized in the testimony of a case agent, below, the undercover operative's story was not pre-planned, but developed during the course of the undercover operation. The case agent already had prepared the numbers reflected in the chart in Paragraph 48 of the affidavit. The Government argues that the agent innocently, and inconsequentially, did not update the chart after the undercover operative's visit to reflect the slight change in monetary figures. The Government also stresses that the discrepancy in monetary figures is but a small piece of a lengthy and detailed probable cause affidavit. As such, the Government's position goes, the affidavit is far from fatal to the propriety of the search conducted pursuant to the warrant.

### III. SUMMARY OF TESTIMONY AND OTHER EVIDENCE

During the aforementioned suppression hearing on April 2, 2024, the Court heard sworn testimony from one witness, namely, Brandon Michael Pritt ("Pritt") who was a case agent involved in the investigation of Defendant and Insurance Depot. The Court also recognized two documents which Defendant at first sought to introduce into evidence but ultimately did not, because they already were of record on the Court's CM/ECF system in this matter or otherwise easily publicly available. Those two items are (1) the probable cause affidavit in question [ECF No. 28-1] and (2) a statute giving rise to certain of the charges in the Indictment, namely Title 28,

---

materially aid Defendant in his argument – insofar as Defendant (if he engaged in the conduct alleged) would have been helping the undercover operative avoid paying *more* in taxes.

United States Code, Section 7206(2), which is the statute cited in the probable cause affidavit for the crime being investigated. Thus, no exhibits *per se* were introduced into evidence.

### A. Pritt's Testimony – Direct Examination

The Government called Pritt to testify. According to his testimony,[3] Pritt testified that he currently is employed with the Garrett County, Maryland Sheriff's Department but previously was employed as a Special Agent with the IRS. [1:52:19 to 1:52:40]. In his capacity at the IRS, he investigated Defendant in the instant matter. [1:53:50 to 1:53:54].

Pritt explained that Defendant was in the business of preparing income tax returns, through the business Insurance Depot. [1:53:55 to 1:54:10]. SDC provided information to Pritt concerning Defendant's operations at Insurance Depot. [1:54:15 to 1:54:26]. Pritt explained that SDC examines returns of tax preparers to spot patterns that are outside the norm of national averages, so as to detect problems. [1:54:27 to 1:54:40]. As to Defendant specifically, the SDC review revealed that Defendant had prepared a high percentage of tax returns with larger-than-expected refunds, and with greater numbers of tax forms Schedule C and Schedule F. [1:54:41 to 1:54:56]. The returns which Defendant prepared were above averages both nationally and within West Virginia. Id.

Pritt explained that Schedule C is used to account for business income (and expenses) for someone who is self-employed. [1:54:57 to 1:55:28]. As an instance when Schedule C would be appropriate to use, Pritt gave the example of an autobody shop that is owned by one person. Id. Schedule C is to be utilized for for-profit businesses, and for businesses that operate with

---

[3] The citations here to times in brackets correspond to the times of the Court's archived audio recording of the suppression hearing on April 2, 2024, which is located on the section of the Court's intranet site for FTR recordings.

consistency. [1:55:29 to 1:55:43]. Further, Pritt explained that Schedule F is much like Schedule C, except that Schedule F is to be used for a farming business specifically. [1:55:45 to 1:55:54].

As for the tax returns which Defendant prepared, Pritt testified that, owing to the anomalies in tax returns prepared by Defendant, the IRS initially suspected a couple of types of impropriety. [1:56:05 to 1:57:22]. First, the IRS suspected that Defendant was inflating business expenses on tax returns. Id. Secondly, the IRS suspected that Defendant was utilizing Schedule C for businesses which should not have been using Schedule C, to assure a refund that otherwise would not be due. Id. In either scenario, a false tax return would be the result. Id.

Pritt gave an overview of the investigative process upon an agent's receipt of materials from the SDC. An agent such as himself reviews the SDC's materials. [1:58:50 to 1:59:26]. The agent then examines a selection of tax returns prepared by the preparer who has been flagged by the SDC to affirm that there are concerning patterns. Id. If there are concerning patterns, then the agent coordinates the use of an undercover operative to have the target of the investigation prepare a tax return for the undercover operative. Id. Finally, the agent prepares and obtains a search warrant for the tax preparer's operations, and executes that warrant. Id. These are the steps which Pritt followed in investigating Defendant. [1:59:27 to 1:59:35].

Pritt acknowledged that his investigation of Defendant was the first one he undertook as an agent which involved allegations of a tax preparer filing false returns. [1:58:18 to 1:58:25]. Pritt stated that the investigation of Defendant began in late 2021 and continued into early 2022. [1:59:37 to 1:59:58]. Pritt left the IRS in the Fall of 2022. Id.

In particular, as to Pritt's investigation of Defendant, Pritt received materials from the SDC and analyzed some of the tax returns from a list of names of Defendant's clients. [2:00:10 to 2:00:42]. Pritt was determining whether he detected the same patterns which the SDC did, and

Pritt indeed saw the same patterns. Id. Particularly, in the Schedule C forms prepared by Defendant, Pritt consistently saw that, as to automobile mileage/expenses, taxpayers were claiming 100 percent depreciation of vehicles, which is atypical. [2:00:43 to 2:02:12]. Taxpayers also were claiming both mileage for and depreciation of vehicles, but it is not permissible to claim both. Id. Additionally, taxpayers were claiming home office expenses consistently. Id.

Pritt also examined Defendant's own personal tax returns. [2:02:15 to 2:03:34]. Pritt saw that Defendant had a Schedule C and a Schedule F. Id. Further, Pritt saw that Defendant sometimes claimed a foster child on Defendant's personal returns, and eventually (*after* preparing the probable cause affidavit for the search warrant) determined that that same foster child was claimed on a different person's tax returns. Id.

Pritt then began preparing an undercover investigation of Defendant and Insurance Depot. [2:03:45 to 2:04:28]. Pritt conducted surveillance to determine when Defendant typically was at Insurance Depot. Id. Then, Pritt recruited an undercover operative. Id. As part of the investigation, the IRS provided to Pritt a correct W-2 for the undercover operative to use, as well as a correct tax return to compare to whatever tax return Defendant ultimately prepared for the undercover operative. Id.

Pritt testified that the IRS has a "blueprint" for arranging such an undercover operation, which he followed. [2:04:30 to 2:05:51]. The IRS creates a mock W-2 for the undercover operative which assures that, if a tax return is prepared correctly, the undercover operative will "owe" the IRS. Id. The IRS also prepares a mock tax return that is prepared correctly based on the mock form W-2. Id. As such, an agent such as Pritt has a good idea of how a tax preparer should correctly prepare the tax return based on the W-2 shared with the preparer by the undercover operative. Id.

8

As for the undercover operation involving Defendant himself, Pritt and the undercover operative utilized both a microphone and a video recorder. [2:05:57 to 2:06:34]. However, Pritt could hear only the audio in real time; the video recording was obtained after the fact. Id.

Pritt testified that the undercover operative went to Defendant's office, provided the W-2 to Defendant, and Defendant generated a tax return showing that the undercover operative owed money to the IRS. [2:07:40 to 2:09:20]. Defendant then asked the undercover operative whether he did any other work which could offset his tax liability. Id. The operative replied that he does odd jobs as a handyman. Id. The operative stated that he did these jobs for friends and family, and was paid in six-packs of beer or maybe a couple hundred dollars. Id. Defendant explained to the undercover operative that he could characterize this work as a business and claim the expenses related to it. Id. Then, Defendant asked the undercover operative if he had a vehicle, cell phone bills, and/or utility bills. Id. The operative explained that he had a 1984 Jeep Grand Wagoneer vehicle on which he had put "a couple hundred" miles, and that he had a cell phone bill. Id. After that interaction, the undercover operative obtained a tax return, which Defendant prepared, showing that he was due a refund from the IRS. Id.

Pritt explained that Defendant generated a refund for the undercover operating by including a Schedule C with the tax return. [2:10:15 to 2:10:58]. The Schedule C reflected business expenses which were greater than the business income, thus offsetting the undercover operative's total income on the tax return and resulting in a refund. Id. Those expenses on the Schedule C were for both vehicle mileage and depreciation. Id. Defendant claimed 100 depreciation of the vehicle. Id.

After the undercover operative's dealings with Defendant, and Pritt's collection of the audio and video from that operation, Pritt prepared an application for the search warrant at issue, including the probable cause affidavit. [2:12:45 to 2:14:44]. Pritt testified specifically about

Paragraph 48 of the probable cause affidavit. Id. Pritt acknowledged that Paragraph 48 includes a chart, and that the chart has three columns. Id. One of the columns, labeled "Accurately Prepared Return," includes monetary amounts taken from the mock tax return which was prepared by the IRS from the mock W-2 utilized for the undercover operation. Id. Pritt also testified about the third column in the chart, labeled "Return JACK OLIVER, II Prepared at Insurance Depot," and explained that the figures in that column were taken from the tax return which Defendant prepared for the undercover operative. Id. There is a difference between the bottom lines of those two columns. Id.

Further, Pritt testified that when the undercover operative made the statements to Defendant about doing handyman work on the side and the associated information to support the tale, this was not concocted in advance of the operation. [2:14:48 to 2:15:34]. Rather, the undercover operative developed the story during the interaction with Defendant. Id. Pritt acknowledged that he did not go back to the IRS to generate an updated, mock return that incorporated the figures which the undercover operative provided to Defendant regarding handyman work. Id. It did not occur to Pritt to do so. Id.

Pritt interviewed Defendant during execution of the search warrant. [2:16:56 to 2:17:36]. Pritt also interviewed several of Defendant's clients, and another agent interviewed other of Defendant's clients. Id. In the course of the search pursuant to the warrant, agents imaged two of Defendant's computers, obtaining digital versions of documents. [2:17:37 to 2:18:28]. Agents also retrieved tax documents in Defendant's office, along with ledgers showing amounts paid by his clients for preparation of tax returns. Id. Agents also retrieved Form 8879s completed by Defendant's clients, which authorized Defendant to file returns for the clients. Id.

### B. Pritt Testimony – Cross-Examination

On cross-examination, Pritt stated that none of Defendant's clients had been interviewed prior to the IRS applying to obtain a search warrant. [2:31:40 to 2:31:51].

Pritt acknowledged that he never worked as a tax preparer or in any business with the purpose of preparing tax returns. [2:33:43 to 2:34:02]. He also acknowledged that he was not trained as an accountant or similar professional. Id.

Pritt stated that, to properly utilize Schedule C, a business need not operate every day to satisfy the requirement that they operate with "continuity" and "regularity." [2:35:35 to 2:35:47]. He also acknowledged that a business need not actually be profitable to be properly operated, only that there be a *motive* to realize a profit. [2:36:05 to 2:36:28].

Pritt testified that when the SDC flags a tax return as problematic, it is not deemed to be definitely false at that time. [2:37:35 to 2:38:25]. Rather, SDC's attention to a tax return results in referral to an agent such as Pritt for further review and investigation. Id.

Pritt also acknowledged that the probable cause affidavit includes statements about what investigators believed, and that belief does not necessarily equal fact. [2:41:02 to 2:41:29].

### C. Pritt's Testimony – Re-Direct Examination

On re-direct examination, Pritt stated that he included turns of phrase about what investigators "believe" (and other non-conclusive qualifiers) because he was taking caution to not overstate the IRS's information gleaned about Defendant up to that point. [3:29:58 to 3:30:45].

As for Jeep Wagoneer vehicle about which the undercover operative told Defendant, Pritt recalled that the milage rates at the time of the undercover operation were approximately 50 cents per mile. [3:31:45 to 3:34:34]. With the undercover operative having told Defendant that he drove

the vehicle "a couple hundred" miles, the "car and truck" expense line of $1,900.00 in Paragraph 47 was a gross overstatement, per Pritt. Id.

## IV. LEGAL ISSUES AND ANALYSIS

Defendant's contention is that the error in Paragraph 48 of the probable cause affidavit is so material that its inclusion renders the entire affidavit devoid of a demonstration of probable cause.

### A. Legal Principles

As a foundational matter, the undersigned notes the well-established principle that the Fourth Amendment of the United States Constitution protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. Moreover, "the general rule [is] that every arrest, and every seizure having the essential attributes of a formal arrest, is unreasonable unless it is supported by probable cause." Michigan v. Summers, 452 U.S. 692, 700 (1981).

"Probable cause" is not defined easily, but the Supreme Court has explained that it may be found in the "totality of circumstances" such that:

> [t]he task of the issuing magistrate is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, including the "veracity" and "basis of knowledge" of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place. And the duty of a reviewing court is simply to ensure that the magistrate had a "substantial basis for ... conclud[ing]" that probable cause existed.

Illinois v. Gates, 462 U.S. 213, 238–39 (1983) (citation and quotations omitted).

The purpose of a motion to suppress is not to challenge the sufficiency or admissibility of evidence. See U.S. v. Musgrave, 726 F. Supp. 1027 (W.D.N.C. 1989) ("As the Government

contends . . . evidentiary issues are better addressed at trial through a motion *in limine* rather than a motion to suppress.").

Specific to the instant matter, there is a two-prong test for a defendant who wishes to successfully challenge the truthfulness of statements provided in support of the issuance of a search warrant. Franks v. Delaware, 438 U.S. 154 (1978). First, a party challenging the affidavit that supports a search warrant must show (under the "intentionality" prong) that "a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit[.]" Id., at 155-156. Second (under the "materiality" prong), that challenger must demonstrate that "with the affidavit's false material set to one side, the affidavit's remaining content is insufficient to establish probable cause." Id., at 156. The challenger must make a showing under both prongs by a preponderance of the evidence. Id.

Finally, a well-established principle is that of the exclusionary rule. This rule holds that a court should exclude evidence obtained by dint of law enforcement's unlawful arrest or search. See Mapp v. Ohio, 367 U.S. 643 (1961). Relatedly, however, a court should suppress evidence in a criminal matter "only … where its deterrence benefits of exclusion outweigh its substantial social costs." Hudson v. Michigan, 547 U.S. 586, 591 (2006) (citations and quotations omitted).

### B. The Franks Analysis

During the hearing of April 2, 2024, Defendant's counsel stated that his cross-examination of Pritt would suffice in eliciting the information needed to meet his burden to show that there is a Franks issue here.

Simply put, the undersigned **FINDS** that there is no Franks issue here, under either prong of the applicable test. First, as to the "intentionality" prong, nothing adduced at the suppression hearing shows that Pritt or any other agent involved made a knowing or intentional false statement

13

or recklessly disregarded the truth. Pritt straightforwardly explained how (1) the IRS prepared monetary figures for the undercover operation in advance of the operation, (2) the undercover operative, in the course of the operation, spun an impromptu tale about doing odd jobs, but then otherwise obtained a false tax return from Defendant as planned, and (3) he (Pritt) prepared the probable cause affidavit including the table of figures within Paragraph 48, utilizing the figures which the IRS prepared in advance. In assembling the figures for Paragraph 48, Pritt rather innocently glossed over the additional financial information that the undercover operative provided in the unplanned portion of the operative's story to Defendant. By no measure did Pritt affirmatively and purposefully scheme to include inaccurate information in the affidavit. Instead, all indications are that Pritt was diligent in assembling an affidavit that was accurate in all other respects.

Second, as to the "materiality" prong, there likewise is no issue with the affidavit. Setting aside (or simply correcting) the information in Paragraph 48 shows just how inconsequential and minor Pritt's omission was. The affidavit is a lengthy, detailed, multi-page presentation, with abundant background information about how the IRS first became suspicious of Defendant, how it had investigated Defendant to that point, and how it intended to continue a measured investigation upon issuance of the search warrant. As such, the omission in Paragraph 48 is of no moment, materially. Even if Paragraph 48 is removed altogether, it is explained elsewhere in the affidavit how the statistical analysis of Defendant's tax returns raised suspicions, and Paragraph 47 contains particulars about how the Schedule C which Defendant allegedly prepared is false.

Additionally as to the "materiality" prong, as the Government persuasively argues, the income of $200.00 from odd jobs should have been included in the "Wages, salaries, tips, etc." line of the "Accurately Prepared Return" column, thus reflecting a figure of $36,774.00 instead

14

$36,574.00. The $200.00 income from odd jobs would not have properly been included in the line for "Schedule C loss" because the odd jobs were not done as part of a regularly-conducted business. In any event, if the omitted information had been included, it would have demonstrated that the tax owed by the undercover operative actually was *greater* than the amount reflected in Paragraph 48's "Accurately Prepared Return" column. Although this greater amount owed likely is only nominally different from what is shown in Paragraph 48, it nonetheless would demonstrate that, had Paragraph 48 included the information as Defendant urges, then Defendant allegedly aided the undercover operative in avoiding an *even larger* tax liability than what is shown.

Therefore, at bottom, even absent the figures from the undercover operative's odd jobs, the affidavit shows how Defendant still allegedly prepared a false tax return. Nothing about the inclusion of the income from the odd jobs would negate Defendant's (alleged) preparation of a false tax return.

## IV. CONCLUSION

Accordingly, the undersigned **FINDS** that Defendant has <u>not</u> made a showing, by a preponderance of the evidence under <u>Franks</u>, that the probable cause affidavit at issue contains a false statement made knowingly and intentionally, or with reckless disregard for the truth. Nor has Defendant made the requisite showing that probable cause was lacking if the incorrect information is set aside. Thus, for the reasons set forth herein, the undersigned **RECOMMENDS** that Defendant's motion to suppress [ECF No. 27] be **DENIED.**

Any party shall have fourteen (14) days (filing of objections) from service of this Report and Recommendation to file with the Clerk of the Court **specific written objections identifying the portions of the Report and Recommendation to which objection is made, and the basis for such objection.** A copy of such objections should also be submitted to the presiding United

States District Judge. Objections shall not exceed ten (10) typewritten pages or twenty (20) handwritten pages, including exhibits, unless accompanied by a motion for leave to exceed the page limitations, consistent with LR PL P 12.

**Failure to timely file written objections to the Report and Recommendation as set forth above shall constitute a waiver of de novo review by the District Court and a waiver of appellate review by the Circuit Court of Appeals.** Snyder v. Ridenour, 889 F.2d 1363 (4th Cir. 1989); Thomas v. Arn, 474 U.S. 140 (1985); Wright v. Collins, 766 F.2d 841 (4th Cir. 1985); United States v. Schronce, 727 F.2d 91 (4th Cir. 1984).

The Clerk of Court is **DIRECTED** to transmit copies of this Report and Recommendation to counsel of record as provided in the Administrative Procedures for Electronic Case Filing in the United States District Court for the Northern District of West Virginia.

Respectfully submitted April 22, 2024.

_____
MICHAEL JOHN ALOI
UNITED STATES MAGISTRATE JUDGE